Good morning. May I proceed, Judge? Yes, you must be counsel for the appellant. I am. Why don't you introduce yourself for the record and proceed. Thank you. My name is Michael Khoury, and I am counsel for Dr. Nick Nguyen. And I'm not embarrassed to say it's taken me 25 years to get here, and I appreciate being here. And the theme of this case, and I don't argue in front of the appellate courts very often, but the theme of this case is to remember what it was like to try cases and be a lawyer when each of you were practicing law on this side of the podium as compared to that side of the podium. And if we engage in that mental exercise, I think you can appreciate the feeling of doom that I felt sitting next to Dr. Nguyen in the trial court and having the trial judge read the 87-count indictment to the jurors, to the prospective jurors, and the looks on the prospective jurors' faces when they were realizing that they were dealing with a case that involved 87 counts. Well, counsel, we have the Blockburger case. Doesn't that pretty much cover that point? The cases that deal – Obviously, you describe the drama in the courtroom, but we have to look specifically at whether there was any bar to listing all 80-plus counts. I think there's a difference between prosecuting a doctor for Medicare fraud, which arises principally from the manner in which the doctor uses the CPT codes and transmits them to Medicare, than from a bank fraud case or a security frauds case. And what doesn't come across in the briefs is that there are doctors – Excuse me just a second. Why is that? Because there are doctors right now that are afraid to bill Medicare and code in a manner in which they'll be reimbursed for what they believe is fair. And in a securities fraud case – It's not going to be fair if you didn't perform the surgery. In a bank fraud case or a security frauds case, Judge, I think there's just a blatant representation or misrepresentation. And there's a policy to pile on the counts because the incentive is – I'm not sure you answered my question. I'm sorry, sir. If you didn't perform the services, then arguably it is a fraudulent billing. But I think there's substantial confusion, as made out by the record in this case, by the testimony of Dr. Chazen and by the other podiatrists from Las Vegas, as to whether the code was even a misrepresentation. Now, obviously that was something for the trier of fact to resolve, which the trier of fact did resolve. But the fact of the matter is that confusion is all over the medical community. And doctors are afraid – I'm not sure I understand what the confusion is. You either performed the surgery or you didn't. I think there's a confusion about what code to use when you perform a certain surgery because the codes don't necessarily spell out in simplistic ABC order what the surgery is and what the surgery isn't. And I believe that doctors in the community wide are confused. And they're confused because what they're doing doesn't necessarily fit into the codes like a round peg would fit into a round hole, so to speak. And that's the confusion. And I think that's one of the reasons why you see a difference. Is this the way you bill? Is this the code? That's how it is transmitted to the intermediate carriers that administer the Medicare claims, through a code. What does the doctor have to fill out? Well, the doctor simply has to fill out a form which has various codes. One code is a diagnosis code, what's wrong with the patient. And another code is called a procedure code, what I did to fix what is wrong. And that is transmitted to Medicare, to the intermediate carrier that administers the claims. All the doctors just put in a number of a code? And other identifying information. Does it say anything about the form of surgery? No, sir. That is correct, sir. And the actual statute itself is very different than the state court statute. The state court statute simply prescribes a billing with an intent to defraud, which is the way these health care fraud cases in the federal system are being charged in every district that I'm aware of. Let me interrupt you for just a second, though. Essentially what you're saying, though, is that every time that the judge, I'm sorry, the doctor writes a code, he or she may potentially be committing Medicare fraud if he or she has used the wrong code, right? Absolutely. In theory, right? Absolutely. Okay. Now, if you lumped all of these events into one count, wouldn't that minimize your ability to defend against each one of these instances? Because then you'd be looking at the totality of the counts rather than each of the individual offenses. So, for example, in the case of the surgery, the doctor could come in and say, this is why I used this code, and thereby avoid liability on that count? I don't think so, Judge, because I think the practical effect on the jurors is that he must have done something wrong, and that when you charge a case like this per billing as opposed to per patient, the prospect of obtaining not guilties, and we did obtain some not guilties, but not guilties on every count is minimal. And what it really does, if that type of charging is upheld, is emphasizes how important Dr. Boren's testimony was to the trial of this case. Well, how is this any different than a check-kiting scheme where you have the same kind of thing, 100 instances of kiting checks? Well, I think there's a policy to pile on the charges in that kind of a case to deter a person that's kiting checks. But in this situation, the policy is different, because what we're doing is we're deterring doctors who aren't even being investigated from billing for services that they believe they should be compensated for when the codes don't necessarily match up with the services that they have prescribed. All right. And I understand your argument, but isn't that the province of the jury? You make your argument to the jury that this was simply a case of 86 instances of putting in the wrong code. It was an error of judgment or whatever, but it certainly wasn't fraudulent. Isn't that why juries are here? Don't they have to? Isn't that your response? Yes, sir. But I think, again, the practical impact of so many counts is for the jurors to believe that he must have done something wrong when he is charged with so many counts. And I believe it's easier to defend the case if charged in accordance with a statute, which requires a scheme and a fraudulent billing, and to separate the counts per patient rather than per billing, because otherwise the statute is meaningless. I don't understand why you can't make that same argument to the jury, notwithstanding the fact that you have an 86-count indictment. I don't believe that it would have been appropriate to argue to the jury that the case should have been charged per patient as opposed to per count. No, no. I'm talking about your ability to make the point to the jurors that these were all putting in the wrong code. That's all. It was oversight or whatever it was. I think that's the point that was made to the jury, sir. But I believe that the impact on the jury of so many counts is that the jury is naturally going to believe that he must have done something wrong. And I think that's why, with no apparent reason that appears on the record, we had 15 not-guilties and I believe approximately 67 guilties, because the codes were generally in all counts the same. And if the explanation as to the not-guilties was accepted by the jury, there doesn't appear to be any reason why the same explanation wasn't accepted to the other 67 counts. Can I ask a question? You referenced securities fraud cases. Essentially what you're saying is this is a question of interpretation of the Medicare statutes, right? I think it's a comparison of the Medicare statutes or the bank fraud statutes or the wire fraud statute. If you had an SEC case, for example, where there was an allegation of accounting misrepresentation and, say, a quarterly statement or what have you, again, you'd have the same issue. You'd have an interpretation of GAAP or GAS or whatever it may be. You can make the same argument in those types of cases, wouldn't you? Right, but I believe there's a difference, Judge, in the charging statute and that this particular charging statute requires as one of its elements a scheme or an artifice, which is one element, and then the second element, as applied to this case, would be a billing with the intent to obtain money for services that weren't rendered. And I believe that otherwise the statute, the scheme part of the statute, is rendered meaningless. And I think one of the reasons why the statute is drafted that way is to be very careful not to convict doctors that are acting in good faith but mistakenly use the wrong code, even though they know that the services they provided does not fit into the definition of the code, because they may have provided more services than required by one code, but less services than required than the next higher level of code, so they fall in between. And this is a situation that I think, although the record isn't very exciting, it's a run-of-the-mill billing fraud case, but it's a situation that I think has implications to doctors that are practicing medicine and podiatry every day and worrying about being charged with a crime for using the wrong code. And it affects how health care is delivered in our community, and certainly highlights how important Dr. Bourne's testimony was for his testimony to be admitted during the trial to counteract the impact on the jury of the 87 counts, because that feeling of doom wasn't necessarily limited to the fact that I knew an 87-count indictment was being read to the jury, but that I also knew that Dr. Bourne's testimony was not going to be admitted, which was the key defense in the case. But let me ask a question. Dr. Bourne was being called to testify as an expert? Yes, sir. On the truth and honesty of the defendant? On two matters. Number one, that the defendant possessed the character trait of honesty, and number two, that he had been diagnosed, in Dr. Bourne's opinion, with something called yasane, which is in the literature, or gullibility. But turning our attention to the first issue, there wasn't really any testing that was performed by Dr. Bourne that would allow him to express an opinion as to Mr. Ginn's character for honesty, was there? Oh, I believe there was, Judge. The report that was written by Dr. Bourne mentions a whole series of tests that are designed to elicit evidence of psychopathology, and one element of psychopathology would be the lack of honesty, and since that was absent, since Dr. Bourne found no pathology, Dr. Bourne, in accordance with the rule which allows proof of character by opinion, would have rendered the expert opinion that Dr. Nguyen, while not suffering from any psychopathology, has the character trait of honesty in his opinion, and he's licensed to do so, or was licensed to do so, because unfortunately Dr. Bourne passed away this last Thanksgiving, but was licensed to do so under the laws of the State of California. And I think that's very, very important. If he's testifying within the four corners of his license, then per se, I believe his testimony was admissible and should have been admitted and was not prescribed by the rule which does not limit proof of character to only lay opinion. Why would that be the key evidence in your defense? As you're arguing here, it seems like the key that you're saying is that these codes are so difficult to get right that in good faith a person could put one code instead of another code. Wouldn't that be the defense rather than some expert testifying that this is a guy of good character and all that? Not only was that the defense. The defense was that there was evidence in the medical records that would have justified the code that Dr. Nguyen utilized, but that's why Dr. Bourne's testimony was so important, to show that Dr. Nguyen acted in good faith without fraudulent intent and was acting in accordance with the instructions he had received from his former boss, which is where Dr. Bourne's testimony on the gullibility issue would have been admissible. Much like the testimony was similar testimony has been admitted by the Third and Seventh Circuits in entrapment cases and in cases dealing with intent to injure Federal officials. How many codes are there? I think of the Internal Revenue Code, Judge. They're in a CPT, what's called a CPT book, which stands for Current Procedural Terminology, and it's about three inches thick. But in all fairness, most of that is for medical doctors. For podiatrists, there's probably only about four to six pages of codes. So essentially, as I understand it, really your defense is that in picking among these codes, a podiatrist could make good faith errors. Correct. That was the defense. And that's why Dr. Bourne's testimony was so important. How is Dr. Bourne's testimony so important to that? Well, Dr. Bourne was going to testify that my client acted in good faith and that, in fact, he had the character trait for honesty and this character trait for gullibility, making him a person that was going to follow the lead of his former boss. And that's relevant to show that he did act in good faith, tends to prove that he did act in good faith, as opposed to what the government proved, attempted to prove at trial, which is that he did not act in good faith. It appears to be directly relevant, sir. Would you like to reserve your remaining two-and-a-half minutes? Thank you. Thank you, counsel. We'll hear from the government. Good morning. Crane Pomerantz from the United States Attorney's Office for the District of Nevada for the United States. If it pleases the Court, I'd like to pick up with Mr. Corey's first argument on the issue of consolidation, the argument that there were too many counts charged. It's black-letter law that an indictment is multiplicitous if it charges a single offense in more than one count. So to the extent the indictment alleged separate violations of the health care fraud statute, it was simply not multiplicitous. The analysis turns on what constitutes a violation of the health care fraud statute. The defendant's position is at odds not only without a circuit cases, which I cited in the brief, Hickman and Cooper, specifically holding that each submission of a false claim constitutes an execution of the health care fraud statute. It's also at odds with the Ninth Circuit cases analyzing the units of prosecution, and I think the Court properly seized upon the comparison to mail fraud, wire fraud, and bank fraud. When you look at the wire fraud statute, each use of the wires is a unit of prosecution. Under the mail fraud statute, each mailing. Under the bank fraud statute, each part of the scheme that creates a separate financial risk for the financial institution constitutes an execution of the scheme. I would submit to the Court that the bank fraud statute is particularly applicable, as argued in the brief, because it was the model for the health care fraud statute. It follows under that precedent that under the health care fraud statute, each submission of a false or fraudulent claim constitutes a violation of the statute. As a result, each time a provider submits a false claim, whether it's 16 patients or 1,600 patients, and whether those patients are seen once or a hundred times, each time that claim is submitted, it constitutes a false claim. I think, Judge O'Scanlan, you touched upon the Blockburger test. Counsel can simply not demonstrate how this indictment violated Blockburger. Each count required proof of one additional fact that the other counts did not. Each count pertained to a different data service for one of 16 patients. To me, the multiplicity argument is very straightforward. It seems that under the Blockburger test, when comparing it to the bank fraud, wire fraud, and mail fraud statutes, and looking at out-of-circuit cases, under any of those standards, the indictment was proper. I'd like to jump now to the issue of Dr. Borum. This case presents an interesting issue under 405, and the United States would be first to concede that it is a close call whether expert character evidence is admissible. The Court can base its decision on Rule 405, and I would be happy to argue to the Court why expert character evidence is not admissible and should not be admissible. But even if defense counsel has succeeded in arguing to the Court that expert character testimony is admissible under Rule 405, he has to leap the additional hurdle of 702. Like the district court, which based its decision on Dr. Borum entirely on Rule 702, this Court can bypass the 405 issue and simply rule that the evidence is inadmissible under 702. Now, nowhere today and nowhere in the brief does defense counsel address the issue of 702. In fact, he takes the position that Rule 702 is irrelevant. I think that's a direct quote from the brief, as if somehow Dr. Borum loses his character as an expert simply because he's testifying on character. And I would submit to the Court there's simply no basis for abdicating the gatekeeper function of 702 in this unique, conceitedly unique issue or unique testimony. Each court that's looked at this issue has commented specifically that matters pertaining to a witness's honesty is simply not a proper subject for expert testimony. And I should take a step back and say we first have to look to whether the expert testimony is a proper subject for an expert. And under the Amarill Four Prong test, the key issue under that is whether it's within the understanding of a lay juror. And I would submit to the Court that there is nothing more or more fundamentally within the understanding of a lay juror than honesty, especially in a case like this where the defendant took the stand. I would submit to the Court that character testimony is simply not a proper subject for expert testimony. The Finley case, this Court specifically noted, I believe, was in a footnote that matters pertaining to witness's honesty or truthfulness is not a proper subject for expert testimony. The Fifth Circuit in Webb ruled similarly, where the appeals court held that the defendant's character for peacefulness was more appropriately addressed by a lay witness. And I think the point was made in the negative in the Rom case in this circuit in which this Court overruled the exclusion of expert testimony. And there's a notation in the case or a note in the case that says, you know, we're overruling the exclusion of the expert testimony specifically because it does not pertain to truthfulness. Judge Benitez, I think you hit on the critical point in questioning, which is the actual tests, and I would submit that this is a key point, the actual tests that were administered to the defendant in this case, the expert, his conclusion was that there was no known pathology. The results of the test, of the tests that were administered to Dr. Wen were perfectly normal. So his assessment on the truthfulness of the defendant in this case simply came from, one, what the defendant told him, and, two, what he observed in this four-hour face-to-face interview when these tests were being administered. And from this, he concluded the defendant was truthful. I think that evidence ---- So basically what happened is that the doctor found that there was no pathology, but that does not necessarily indicate that he was telling the truth or that he would be a person who would normally tell the truth. I would submit to the Court that there's no conclusion you could reach from that. Right. There simply was no pathology. And he could have testified that there was no pathology, assuming the other hurdles were met. But he goes that extra ---- he takes that extra leap and says, well, therefore, I conclude he's truthful, when that conclusion is based on no more than his observation of his patient, the defendant, during this single four-hour meeting. I'd be happy to address the 405 issue if the Court would please. It was not touched on by defense counsel. If the Court doesn't have any other questions, I'd be inclined to sit down. No further questions, counsel? Thank you. Mr. Corey, you have some reserved time. Thank you, Judge. I think that the arguments being made by my colleague from the United States Attorney's Office are wonderful arguments that should have been made to the jury after Dr. Borum testified. The offer of proof that is in the record is that Dr. Borum would have testified that Dr. Nguyen had a character trait for honesty, which is directly relevant to the issues, to what had to be proved by the government in the case. This is not some other type of criminal case where intent to defraud isn't an element, where I would be the first one to agree that the issue of honesty is something that should be left to the jury. This is a case where the intent to defraud, the defendant's mental state, and the character trait of honesty is directly relevant. But isn't there a difference between having a pathology for falsehoods, if you will, and a character trait for honesty? Aren't those two different things? In fact, aren't they sort of diametrically opposed to one another? No, Judge, because if someone does not have the pathology for dishonesty, then someone, by definition, is an honest person. There's no neutral zone, and Dr. Borum was licensed by the State of California to give the very opinion that was proffered in our offer of proof. And so I believe that under 405, he was entitled to give that opinion because the rule does not limit proof of character to lay opinion. And I believe that under 702, he was also entitled to testify to the types of behaviors and symptomatology that you would see from a dishonest person in the testing, and then the absence from that would have allowed me to argue to the jury that Dr. Nguyen is an honest person. Now, if the jury didn't want to accept it, the jury didn't want to accept it. But to exclude it, I believe, was error. Again, as to the gullibility aspect, Dr. Borum would have testified to his testing for that aspect. Dr. Borum would have testified to the symptoms that you would see from a gullible person who is gullible in a pathological way. And the argument to the jury that Dr. Nguyen's coding was in good faith because it was based upon the teachings he received from Dr. Miller, his prior boss, the Medicare liaison, would have been substantiated by expert testimony. I believe the testimony was clearly relevant and should have been admitted. And with that ---- How long was he separated from his former boss, Miller? I believe that he separated from Dr. Miller sometime in 1999, and the indictment picked up in 1999 and went through 2002, I believe. Thank you, counsel. Your time has expired. Thank you. The case just argued will be submitted for decision.
judges: Hug, O'scannlain, Benitez